RICHARD W. AND LAURIE TORNEY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Torney v. Commissioner
Docket No. 7366-91
United States Tax Court
T.C. Memo 1993-385; 1993 Tax Ct. Memo LEXIS 390; 66 T.C.M. (CCH) 493; August 24, 1993, Filed *390 Decision will be entered under Rule 155. For petitioners: P. Gary Ferrero and Michelle Turpin. For respondents: David L. Miller. CLAPP
CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION CLAPP, Judge: Respondent determined the following deficiencies in and additions to petitioners' Federal income taxes: Additions to Tax
Year
Sec. Sec. Sec. Sec. Ended
Deficiency
6653(a)(1)(A)
6653(a)(1)(B)
6659 6661 1986
$ 24,310
$ 1,216
[1]
$ 5,754
$ 1,508
1987
26,635
1,332
[1]
3,534
4,062
After concessions, the remaining issues for decision are: (1) Whether petitioners held certain stock for at least 6 months prior to contributing it to a qualified charitable organization. We hold that they did not. (2) What was the fair market value of petitioners' stock on the day they contributed it to a qualified charitable organization. We hold that the stock had zero value. (3) Whether petitioners' acquisition and contribution of stock to a qualified charitable organization should be disregarded because it lacked economic substance. We hold that it should. (4) Whether petitioners are liable for additions *391 to tax under sections 6653(a)(1)(A) and (B), 6659, and 6661, as determined by respondent, and for additions to tax under section 6621(d) as argued by respondent on brief. We hold that they are liable for additions to tax under sections 6653(a)(1)(A) and (B) and 6661, but are not liable for additions to tax under sections 6659 and 6621. All section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated. FINDINGS OF FACT We incorporate by reference the stipulation of facts, the first supplemental stipulation of facts, the second supplemental stipulation of facts, and the attached exhibits. At the time the petition was filed, petitioners were residents of Salt Lake City, Utah. Amenity, Inc. (Amenity), was incorporated in the State of Utah on January 7, 1986, with a capitalization of 100 million shares each having a one-tenth of 1 cent par value. The original incorporators and initial board of directors of Amenity were Julie Harmon, Cynthia Paskett, and Jeri Pettersson. Amenity was formed as a shell corporation for the purpose of merging into an operating *392 corporation. On or after January 8, 1986, Amenity stock certificate No. 1 for 1 million restricted shares was issued to Capital General Corporation (CGC). National Stock Transfer (NST), was the transfer agent and registrar for Amenity. In 1986, David Yeaman (Yeaman), was president of both CGC and NST, and Cynthia Paskett was secretary/treasurer of both CGC and NST. Jerry Peterson was vice president of NST, and Jeri Pettersson was vice president of CGC. Out of the original 1 million shares of Amenity stock that CGC owned, it was reissued 246,800 restricted shares, evidenced by stock certificate No. 2. The remainder of the 1 million Amenity shares that had been represented by stock certificate No. 1 was given to a variety of people. Six blocks of 10,000 restricted shares were given to various employees and officers of CGC and NST, and to Yeaman's business associates. Another of Yeaman's business associates and Yeaman's family holding corporation each received a block of 300,000 restricted shares. Finally, the remaining 93,200 shares were broken into approximately 930 blocks of approximately 100 unrestricted shares and were issued, generally without any quid pro quo, to various *393 current and former contacts, customers, friends, and associates of CGC as "loyalty" shares. The purpose of "loyalty" shares was to create a "broad" "public" base of stock ownership without having to comply with the rules and regulations of the Securities and Exchange Commission. At the time that Amenity was incorporated, CGC had not considered any operating company for a merger with the shell corporation. However, in mid-1986 Bertram Elkin (Elkin), and Frederick Weiss (Weiss), became interested in acquiring a majority interest in Amenity. At a board of directors meeting on July 9, 1986, the Amenity directors voted to elect Elkin and Weiss as directors and joint chairmen of the board of Amenity, to issue 4 million restricted shares of Amenity stock to Elkin and Weiss, 2 million to each, to move the corporate offices to San Francisco, California, and to change the name of the corporation to Elkin, Weiss and Companies, Inc. (Elkin, Weiss). The name change was effectuated on July 22, 1986. After the name change, Amenity stock certificate No. 2 was canceled, and Elkin, Weiss replacement certificates were issued to Gordon Croft (Croft), and CGC. Out of the 246,800 shares represented *394 by stock certificate No. 2, Croft received 25,000 restricted shares of Elkin, Weiss stock, represented by stock certificate No. 2063, and CGC received 221,800 restricted shares of Elkin, Weiss stock, represented by stock certificated No. 2064, dated September 8, 1986. During 1986, Amenity/Elkin, Weiss was capitalized with $ 35,000 cash and three parcels of real property, one of which was residential property and the others of which were unimproved commercial property. The company had no revenue that year, operated at a loss, and paid no dividends. The business plan of Elkin, Weiss was to engage in a number of different kinds of investment banking and mortgage-related activities. However, the company had no experience in that area and had made no progress toward such business by the end of 1986. Shortly after Amenity became Elkin, Weiss, the company's unrestricted stock began trading on the market. From that time until early December 1986, only a few thousand shares changed hands, most of which were sold in blocks of 100 or 200 shares. All of the ultimate buyers were insiders. Sometime during 1986, Yeaman offered to Richard Paul (Paul), one of his business associates, shares *395 of stock in Amenity/Elkin, Weiss. Paul indicated that he would like various friends and business associates to have the stock and gave Yeaman a list of names, including petitioners', in which the stock should be issued. No stock certificate was ever issued in Paul's name. Richard Torney (petitioner), and Paul are close friends who had been Mormon missionaries together in Uruguay. Paul decided to name petitioners as recipients of the Amenity/Elkin, Weiss stock as a gesture of friendship because petitioners had recently married. Paul saw this as a way of making up for losses that petitioner had incurred on investments that Paul had recommended. Petitioners received 25,000 shares of restricted stock, represented by Amenity stock certificate No. 1073, dated January 14, 1986. Petitioners' shares were issued from CGC's Elkin, Weiss shares, represented by stock certificated No. 2064, dated September 8, 1986. Petitioners never received the original stock certificate representing their shares; they received only a copy. Yeaman approached Paul regarding World Family Corporation (World Family), a charitable organization of which Yeaman was a trustee. Yeaman asked Paul if he knew anyone *396 who would like to make a contribution to World Family. World Family was organized to help fund Mormon missionaries, so Paul suggested that petitioners donate their Amenity/Elkin, Weiss stock. When petitioners agreed, Paul made the necessary arrangements, sending petitioners the papers to be signed and a copy of the National Quotation Bureau price report (the pink sheet), for the unrestricted Elkin, Weiss stock for December 8, 1986. On their 1986 tax return, petitioners took a charitable deduction in the amount of $ 75,000 (25,000 shares at $ 3.00 per share) for the stock they donated to World Family. They based their deduction on the trading price quoted on the pink sheet which they concluded was the fair market value of their stock. In filling out their Form 8283, petitioners stated that the stock had been purchased and that they had a $ 5,000 basis in the stock. OPINION Section 170(a) allows a deduction for the fair market value of property donated to an organization described in section 170(c). For individuals, the deduction is limited to 30 percent of adjusted gross income (computed without regard to net operating loss carrybacks), if a sale of the property would have *397 produced long-term capital gain had it been sold for fair market value at the time of the contribution. Sec. 170(b)(1)(C). If the gain on such a hypothetical sale would have been a short-term capital gain rather than a long-term capital gain, the deduction is limited to the donor's basis in the contributed property. Sec. 170(e)(1). The parties agree that petitioners had a zero basis in their stock. For the year at issue, a long-term capital gain was a "gain from the sale or exchange of a capital asset held for more than 6 months". Sec. 1222(3). Therefore, if petitioners did not hold the stock for more than 6 months, they were not entitled to any deduction for the contribution of the stock to World Family. It is well settled that --
Deductions are a matter of legislative grace, and taxpayers must satisfy the specific statutory requirements of the deductions they claim. Deputy v. du Pont, 308 U.S. 488 (1940); New Colonial Ice Co. v. Helvering, 292 U.S. 435 (1934). Taxpayers bear the burden of proving entitlement to the deductions they claim. Welch v. Helvering, 290 U.S. 111 (1933); *398 Rule 142(a). These rules apply with equal force to charitable contributions. * * * [Allen v. Commissioner, 92 T.C. 1, 7 (1989), affd. 925 F.2d 348 (9th Cir. 1991).]
In the case before us, petitioners have not carried their burden of proof. Petitioners contend that, because Paul unconditionally directed that the stock be issued to petitioners in January or February and a copy of the certificate was delivered shortly thereafter, petitioners held the stock as of the date Paul named them as the recipients. They argue that a stock certificate is merely evidence of ownership, and, therefore, the date the stock was issued was not necessarily the date they became owners of the stock. Moreover, they maintain the evidence shows that the stock certificate must have been issued before May 17, 1986, so even if the issue date is the starting point for measuring the holding period, they held the stock for more than 6 months. We disagree. Under Utah law, a purchaser of a security does not acquire ownership rights in that security until the security is delivered to the purchaser. Utah Code Ann. sec. 70A-8-301 (1980). If stock *399 is a gift, delivery is not essential; however, there must be clear and convincing evidence that a gift has been made and ownership has been transferred. Estate of Ross v. Ross, 626 P.2d 489 (Utah 1981). Petitioners did not present sufficient evidence to prove that any gift of stock and transfer of ownership to them was completed more than 6 months prior to the donation of stock to World Family. The mere direction by Paul to CGC to transfer the stock to petitioners would not be enough to complete the gift; some additional action, such as issuing the stock certificate, noting the transfer on the corporate books, or allowing petitioners to vote the stock would be necessary before petitioners could be treated as owning and, therefore, holding the stock. Id.; Rasmussen v. Sevier Valley Canal Co., 121 P. 741 (Utah 1912). Moreover, even if the direction by Paul was enough to complete the gift to petitioners, they have not presented sufficient evidence that such direction took place more than 6 months prior to the donation of the stock. Petitioners' evidence of when Paul directed the shares to be issued to petitioners *400 and when the stock certificate was issued consisted of testimony by Paul and petitioner and of a copy of stock certificate No. 1073, dated January 14, 1986, and signed "Shail" by Patricia Shail-Berryman (Shail-Berryman), as a representative of NST, the transfer agent. Paul testified that in early 1986 he received a stock certificate with a stock power from Yeaman, who asked Paul to whom he wanted the shares issued. Paul stated that he gave the certificate back to Yeaman with a list of friends and business associates, including petitioners, who should receive the stock and that he delivered copies of the stock certificates to the individuals. He was unclear exactly when those events took place; he thought it was probably January or February, but he was certain it was before April. However, he also testified that petitioners were recently married when he gave them the stock, and petitioners were not married until July 1986. Furthermore, we did not find Paul to be a credible witness. Much of what he said did not ring true, and without credible evidence to back up his testimony, we are not persuaded that he was accurate about when petitioners' stock was issued. Petitioner testified *401 that he received a copy of the stock certificate in either February or March of 1986, but he could not be more specific than that. He remembered that it was cold and snowing. We find that petitioner's self-serving testimony also lacked credibility. He has changed his story regarding this stock as it suited his needs. On his tax return, he stated that he had purchased the stock and had a basis of $ 5,000 in the stock. We are not satisfied with the explanation he gave at trial regarding that entry. When he first met with the Internal Revenue Service auditor he stated that the stock had been a gift from his parents. That statement was memorialized in a document request sent to petitioner asking for a copy of his parents' gift tax return, among other things. Petitioner answered the document request without indicating that the stock had not been a gift from his parents. He later told the auditor that a business associate had given the stock to him. At trial, petitioner denied he ever had told the auditor that the stock was a gift from his parents. We did not find petitioner to be believable and are not persuaded by his testimony regarding when he received the copy of the stock *402 certificate. Petitioners maintain that their stock certificate must have been issued before May 17, 1986, because Shail-Berryman signed the certificates "Shail", and she would not have done so after her marriage on May 17. We do not find that fact to be as "overwhelming" as petitioners think it is. Shail-Berryman testified that she did not know for certain when the stock certificate was issued, but it was prior to her marriage because it was signed "Shail". However, even though she was married, Shail-Berryman could have signed the stock certificate "Shail" if she so chose, or if she accidentally slipped into using her maiden name. In addition, the documentary evidence indicates that the stock certificate was probably issued in September 1986. The transfer document is dated September 20, 1986, and no satisfactory explanation was given as to why the transfer document would not be prepared until 8 months after the stock certificate was issued. For most of the transactions for which we have both the transfer document and the stock certificate, the transfer document is dated the same day or shortly before or after the date on the stock certificate. The only transfers where there *403 was a significant gap between the dates on the stock certificates and the dates on the transfer documents were transfers in which the stock eventually was given to charity or which were related to such transfers. Moreover, the transfer document on which the issuance of petitioners' stock was recorded indicates that their stock was issued from stock certificate No. 2064. Stock certificate No. 2064 is an Elkin, Weiss certificate dated September 8, 1986. Petitioners have not explained how their stock certificate could have been issued before the stock certificate out of which their stock was transferred. Therefore, we hold that petitioners have not established that they held the Amenity/Elkin, Weiss stock more than 6 months prior to contributing it to World Family. Petitioners argue that, even if we find that they did not hold the stock for the requisite 6 months, they can tack Paul's holding period because they received the stock from him as a gift. Under section 1223(2) -- In determining the period for which the taxpayer has held property however acquired there shall be included the period for which such property was held by any other person, if under this chapter such property *404 has, for the purpose of determining gain or loss from a sale or exchange, the same basis in whole or in part in his hands as it would have in the hands of such other person.
If petitioners received their stock by gift, their basis in the stock would be the same as the basis of the stock in the hands of the donor. Sec. 1015. If petitioners received the stock as a gift from Paul, they would be able to tack his holding period to theirs. However, Paul had no holding period because he never held the stock. No stock ever was transferred to Paul; he merely named the people to whom the stock would be transferred. Therefore, petitioners had nothing to tack to their holding period to help them reach the 6-month holding period requirement under section 1222. Furthermore, petitioners would not be able to tack the holding period of CGC from whom they received their stock because that transfer does not meet the definition of a gift for Federal tax purposes. In order to establish that the stock transfer was a gift, petitioners must demonstrate more than merely a transfer without compensation or consideration; in addition, they must show that the transfer proceeded out of a feeling of *405 detached and disinterested generosity. Commissioner v. Duberstein, 363 U.S. 278, 285 (1960). Petitioners have not made such a showing. On the contrary, the evidence demonstrates that CGC expected to benefit from the stock transfers through strengthened business relationships. Paul indicated that stock was allocated to him because Yeaman thought his business experience might be helpful to CGC. If a transferor expects to benefit in this fashion from a transfer, then the transfer is not a gift for Federal tax purposes. Id. Therefore, the stock transfer to petitioners was not a gift, and petitioners cannot tack CGC's holding period to theirs. We hold that petitioners did not hold their Amenity/Elkin, Weiss stock for more than 6 months and, consequently, could deduct only their cost basis, which was zero, for their contribution of the stock to World Family. Additionally, even if petitioners did hold their stock for more than 6 months and they were entitled to deduct the fair market value of the stock, the deduction would be zero because the stock had no value. The fair market value of property is "the price at which the property would change *406 hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." Sec. 1.170A-1(c)(2), Income Tax Regs.
As to the valuation issue, each party proffered the testimony and report of a securities broker. Both brokers had extensive experience trading securities, including restricted stock. The Court accepted both brokers as experts, and their testimony and expert reports were admitted as such. In considering this issue, once again this Court is faced with the task of resolving differences in the opinions of qualified experts. Once again, we must advise counsel that valuation issues such as this are better suited for the give-and-take of the settlement process than for adjudication. See Buffalo Tool & Die Manufacturing Co. v. Commissioner, 74 T.C. 441, 451 (1980); Messing v. Commissioner, 48 T.C. 502, 512 (1967). Moreover, although we note that the experts made an unsuccessful attempt to consult the week of trial, after this Court suggested that such an attempt be made, the parties did not make any effort to ensure such a consultation *407 in an effort to come up with an agreed value. Therefore, since the parties were unable to resolve their differences, the Court must do it for them. To arrive at the value of petitioners' stock, petitioners' expert, Henry G. Beam III (Beam), used the price for the unrestricted stock reported on the pink sheet for December 8, 1986, and in the other National Quotation Bureau reports for December 1986 and discounted it by one-half because petitioners' stock was restricted. Beam admitted that transactions are the best evidence of the value of stock, but did not consider any transactions because he did not have access to that information. He also failed to take into account the value and financial health of the underlying corporation. Moreover, because petitioners had donated their stock, Beam valued the stock differently than if petitioners had sold the stock. Finally, we note that Beam seemed to emphasize the subjective knowledge that petitioners had rather than objective standard of "reasonable knowledge of all relevant facts." By contrast, respondent's expert, Stephen L. Hunsaker (Hunsaker), considered a variety of factors in arriving at his valuation of petitioners' stock. *408 Hunsaker started by discounting the trading price of the unrestricted stock by one-half because petitioners' stock was restricted. However, he did not rely on the pink sheets to determine the trading price of the stock because the pink sheets are unreliable; instead, he used actual transactions. In addition, he considered the business risk, financial risk, and liquidity risk of the corporation, as well as the trading history of the stock and the size of petitioners' block of stock compared to the number of shares that had been traded. Hunsaker testified that petitioners' stock might have been worth 25 cents per share, but he would not have paid that much for it. Moreover, he stated that there was no legitimate demand for Elkin, Weiss stock, so if petitioners had tried to sell their 25,000 shares, the market would not have been able to absorb those shares. Based on all of these criteria, Hunsaker concluded that the stock had little or no value. We have considered the qualifications and experiences of the parties' experts, their particular knowledge and experience in valuing stock, as well as the substance and reasoning of their reports and testimony. Hunsaker considered a variety *409 of facts about Elkin, Weiss and the market for its stock and did not rest his conclusion on any one piece of information. In addition, his analysis was not affected by the fact that the stock was donated rather than sold. Beam based his conclusion on one piece of information, the quotation on the pink sheets, and did not consider all the relevant facts as required. Moreover, he valued the donated stock differently than if the stock had been sold, even though the fair market value is determined by the price between a willing buyer and a willing seller. We conclude that Hunsaker's comprehensive approach was more convincing. Therefore, we hold that petitioners' stock had no value on December 8, 1986. Finally, we note that petitioners would not be entitled to a deduction for the contribution of their stock because the transaction lacked economic substance. In making that determination, we looked to the substance of the transaction and determined "whether what was done, apart from the tax motive, was the thing which the statute intended." Gregory v. Helvering, 293 U.S. 465, 469 (1935). The substance of the case before us is transfers of stock between *410 related entities with petitioners acting as a conduit. See Allen v. Commissioner, 92 T.C. 1 (1989), affd. 925 F.2d 348 (9th Cir. 1991). The stocks involved herein were never supported by anything but assets of highly questionable, minimal value and the value used throughout was overstated and rigged to create a large charitable deduction where none existed. The whole scheme was a confusing mess of paper shuffling, rather inartfully carried out by a group of people with dubious motives. Petitioners never exercised any control over the stock. They merely held a photocopy of the stock certificate and signed the assignment documents when directed. Moreover, World Family never benefited from ownership of the stock and listed the stock as having no value after 1987 on its Form 990. We hold that petitioners' donation of the stock lacked economic substance and, therefore, was not a charitable contribution within the meaning of section 170(a). Respondent determined petitioners were liable for additions to tax for negligence under section 6653 and for substantial understatement of income tax under section 6661. Negligence under *411 section 6653(a) is a "lack of due care or failure to do what a reasonable and prudent person would do under the circumstances." Neely v. Commissioner, 85 T.C. 934, 937 (1985) (quoting Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967)). A substantial understatement exists if the difference between the amount of income tax required to be shown on the return and the amount of income tax actually shown on the return exceeds the greater of 10 percent of the tax required to be shown, or $ 5,000. Sec. 6661(b)(1) and (2). The addition to tax under section 6661 may be waived by respondent if the taxpayer had reasonable cause for the understatement and acted in good faith. Sec. 6661(c). Petitioners' only argument with respect to these additions is that by relying on the pink sheets to determine the value of their stock, they acted as reasonable and prudent persons would have and that they acted in good faith. They rely on Rev. Rul. 77-287, 1977-2 C.B. 319, in support of their position that they were entitled to rely on the pink sheets in determining the fair market value of *412 their stock. However, that revenue ruling does not sanction reliance on one piece of information in determining the fair market value of restricted stock, particularly where the information, i.e., the pink sheets, bore little or no relationship to what was happening in a very thin market, controlled by insiders. The revenue ruling requires all facts and circumstances to be taken into account, and notes that "Earnings, net assets, and net sales must be given primary consideration in arriving at an appropriate discount for restricted securities from the freely traded shares." Id. at 321. Petitioners, who were not as naive as they would have the Court believe, did not consider any facts other than the bid-and-ask price of unrestricted stock listed on the pink sheets. The pink sheets were too good to be true. We hold that petitioners did not act reasonably and in good faith and are liable for additions to tax under sections 6653 and 6661. Respondent also determined that petitioners were liable for additions to tax for valuation overstatement under section 6659 and, on brief, asked us to impose an addition to tax for tax-motivated *413 transactions under section 6621(d). Although we did determine that petitioners had overstated the value of their stock, and engaged in a transaction without economic substance, we also decided as a threshold matter that no charitable deduction is allowable on a separate ground, namely, that the stock is short-term capital gain property; therefore, petitioners are not liable for the additions to tax under sections 6659 and 6621. Gainer v. Commissioner, 893 F.2d 225 (9th Cir. 1990), affg. T.C. Memo. 1988-416; Todd v. Commissioner, 862 F.2d 540 (5th Cir. 1988), affg. 89 T.C. 912 (1987). Decision will be entered under Rule 155. Footnotes
1. 50 percent of the interest due on the deficiency.↩